*445 SUMMARY ORDER
E.I. DuPont De Nemours and Company (“DuPont”) appeals from a judgment of the United States District Court for the District of Vermont (Murtha, J.), entered April 16, 2007, upon a jury verdict in favor of Fab-Tech, Inc. (“Fab-Tech”). The jury found DuPont liable for two counts of breach of contract and two counts of violating the covenant of good faith and fair dealing, claims arising from DuPont’s alleged failure to abide by two contracts it had with Fab-Tech (the “1999 Agreement” and the “2000 Agreement”). We assume the parties’ familiarity with the underlying facts, procedural history, and specification of the issues on appeal.
Central to this appeal is whether the district court was correct to conclude that the 1999 and 2000 Agreements were predominantly concerned with the provision of services and thus were not governed by the UCC. We agree with DuPont that this conclusion was reached in error.
Analyzing this issue under Vermont law, we note initially that Vermont does not apply a “blended” approach to the question of UCC applicability such that a court may “apply the UCC only to the sale of goods elements of the contract.” BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1329 n. 13 (11th Cir.1998) (citing Foster v. Colo. Radio Corp., 381 F.2d 222, 226 (10th Cir.1967), as exemplifying this approach). Rather, like most jurisdictions, see id. at 1329, Vermont applies the “predominant purpose” test when deciding whether a contract falls under the UCC: “[Wjhere, as here, a transaction contains elements of both sales and service, application of the UCC, including the four-year statute of limitations under [Vt. Stat. Ann. tit. 9A,] § 2-725(1), turns on whether the transaction ‘predominantly,’ or essentially, relates to goods or services.” Lamell Lumber Corp. v. Newstress Int’l, Inc., 182 Vt. 282, 938 A.2d 1215, 1222 (Vt.2007); accord Ope-naire, Inc. v. L.K. Rossi Corp., 182 Vt. 636, 940 A.2d 724, 726 (2007). “In determining the essential or predominant aspect of an agreement, courts typically look to several factors. Foremost among these are the language of the agreement itself and the circumstances of its making and performance.” Lamell Lumber Corp., 938 A.2d at 1222 (citing Insul-Mark Midwest, Inc. v. Modem Materials, Inc., 612 N.E.2d 550, 555 (Ind.1993); DeGroft v. Lancaster Silo Co., 72 Md.App. 154, 527 A.2d 1316, 1322 (Md.Ct.Spec.App.1987)).
Applying these principles to the case at hand, we observe that the 1999 and 2000 Agreements are predominantly concerned with laying out the terms of Fab-Tech’s right to purchase coating products, which are “goods” under Vermont’s UCC. See Vt. Stat. Ann. tit. 9A, § 2-105(1). The prices given in the contract relate entirely to the goods being delivered rather than to any service being performed. Cf. Camara v. Hill, 157 Vt. 156, 596 A.2d 349, 351 (1991) (noting fact that contract prices “all related to goods, not services,” as indication that contract was predominantly for goods). In addition to being dubbed “supply arrangements],” the agreements explicitly incorporate DuPont’s “standard terms and conditions for sales,” which in turn refer to the contractual parties as “Buyer” and “Seller.” Cf. BMC Indus., Inc., 160 F.3d at 1330 (“Contractual language that refers to the transaction as a ‘purchase,’ for example, or identifies the parties as the ‘buyer’ and ‘seller,’ indicates that the transaction is for goods rather than services.”). While the agreements also contain provisions concerning exclusivity, marketing, delivery, and other arguably service-related matters, these matters are all incidental to the sale of DuPont’s coating product. Even the additional benchmarks imposed on Fab-Tech in the 2000 Agreement are merely conditions in *446 tended to ensure Fab-Tech’s continuing need for DuPont coating products in Korea and Taiwan. Like the 1999 Agreement, the 2000 Agreement is, fundamentally, a requirements contract providing exclusive dealing in the sale of goods. See Vt. Stat. Ann. tit. 9A, § 2-306 (providing UCC standards applicable to requirements and exclusive dealings contracts, including that “[a] lawful agreement ... for exclusive dealing in the kind of goods concerned imposes ... an obligation ... by the buyer to use best efforts to promote their sale”); Vogel v. W.A. Sandri, Inc., 898 F.Supp. 254, 257 (D.Vt.1995) (applying UCC § 2-306 to identify agreement at issue as requirements contact); cf. Monetti, S.P.A. v. Anchor Hocking Corp., 931 F.2d 1178, 1184 (7th Cir.1991) (observing that even “[distributorship agreements, ... and ... sales of businesses as going concerns, are frequently though not always classified as UCC contracts under the predominant-purpose test”).
The district court’s reasoning does not compel a contrary conclusion. First, the agreements’ introductory reference to the years the parties spent to “develop the market for stainless steel corrosive fume exhaust duct systems,” Ex. 16 at 1; Ex. 17 at 1, does not alter the substantive provisions’ focus on the transaction of DuPont’s coating product. While introductory recitals in a contract may shed light on the motives behind forming the contract, see H.P. Hood & Sons v. Heins, 124 Vt. 331, 205 A.2d 561, 565 (1964), they “are not strictly a part of the contract and ... they do not extend and broaden the contract stipulations where ... the recitals are broader than the stipulations,” Fassler v. Okemo Mountain, Inc., 148 Vt. 538, 536 A.2d 930, 933 (1987). It is true that DuPont and Fab-Tech had previously worked together on designing the coating product, ducts, and application method, but they had completed that stage of their relationship by the time the agreements at issue were executed. In the 1999 and 2000 Agreements, DuPont acts merely as the supplier of the previously designed coating product and does not even help Fab-Tech with applying the product. Cf. Matthews v. Metro. Contract Carpets, No. 88-0935, 1988 WL 124900 at *2 (E.D.Pa. Nov.23, 1988) (“If the contract had simply called for [the defendant] to supply a can of acrylic coating, the agreement would doubtless have been a sales contract. However, that [the defendant] was brought in to strip an existing layer of [wax from the floor] and to lay on a new surface indicates that this was predominantly a contract to apply, rather than supply, an acrylic finish.” (emphasis added)); Insul-Mark Midwest, 612 N.E.2d at 555-56 (citing Matthews favorably and determining that contract was service-oriented where company shipped screws to another company for the “service” of having screws coated with rust-resistant material and sent back). As for the district court’s determination that the “more essential character” of the contracts is their role as “agreements by which the parties seek to jointly develop new markets,” Fab-Tech, Inc. v. E.I. DuPont De Nemours & Co., No. 104-cv-275, 2006 WL 3702753 at *4 (D.Vt. Dec.13, 2006), DuPont correctly points out that the clause the district court cites to support this proposition refers to the development of new markets, products, or product applications only as a possibility which, if it came to pass, would simply oblige Fab-Tech to purchase any new fluoropolymer requirements exclusively from DuPont. Even if this clause could be construed as service related, it cannot outweigh the agreements’ overall focus on the sale of DuPont’s coating products.
As a result of our holding that the UCC applies to the agreements at issue, we agree with DuPont that Fab-Tech’s breach-of-contract claim arising from the 1999 Agreement is barred by the UCC’s *447 four-year statute of limitations for such claims. See Vt. Stat. Ann. tit. 9A, § 2-725(1) — (2). Because the jury awarded no damages on this claim, however, its preclusion does not directly reduce the damages award against DuPont.
Moreover, we reject DuPont’s contention that the district court irredeemably tainted the jury verdict by allowing evidence on the 1999 Agreement to be submitted to the jury. This Court reviews the district court’s decision to admit evidence for abuse of discretion, Annis v. County of Westchester, 136 F.3d 239, 247 (2d Cir.1998); Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 16 (2d Cir.1996), and will grant a new trial on this basis “only if we are ‘convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice,’” Annis, 136 F.3d at 247 (quoting Pescatore, 97 F.3d at 17). We find neither abuse in the admission of evidence concerning the 1999 Agreement nor any prejudice to DuPont. The 1999 Agreement and its surrounding circumstances were relevant to interpreting the terms of the 2000 Agreement and ascertaining the intentions of the parties. Even if this were not the case, DuPont failed to show that it was clearly prejudiced by the admission of evidence concerning the 1999 Agreement. To the contrary, (i) the relevant language of the 1999 Agreement is nearly identical to that in the 2000 agreement; (ii) the jury awarded no damages on the 1999 Agreement; and (iii) at trial, the parties introduced other evidence concerning their relationship dating from as far back as 1991 (including a 1998 contract worded similarly to the 1999 and 2000 Agreements). Therefore, we deny DuPont’s request for a new trial based on this issue.
Turning to the 2000 Agreement, DuPont effectively conceded in oral argument that the application of the UCC does not affect the award of compensatory damages to Fab-Tech for DuPont’s breach of this Agreement. On the other hand, DuPont does contend that the application of Vermont’s UCC bars Fab-Tech from basing any right of action or punitive damages award on the implied covenant of good faith and fair dealing. Vermont common law recognizes a right of action for breach of the covenant of good faith and fair dealing, see, e.g., Carmichael v. Adirondack Bottled Gas Corp. of Vt., 161 Vt. 200, 635 A.2d 1211, 1216-17 (1993), and it allows juries to award punitive damages for such claims, see, e.g., Monahan v. GMAC Mortgage Corp., 179 Vt. 167, 893 A.2d 298, 316-17 (2005). However, Vermont courts have not addressed whether a litigant may still secure punitive damages via a common law good faith claim when the contract at issue is governed by the UCC.[1]
We need not decide this issue of Vermont law, however, because even assuming that punitive damages are available for violation of the covenant of good faith and fair dealing in a UCC-governed contract in Vermont, we conclude that the district court erred in denying DuPont’s motion to set aside the jury’s punitive damages award as a matter of law. Vermont law limits punitive damages for breach of the covenant of good faith and fair dealing to cases of “morally culpable” and “truly reprehensible” conduct, where “defendant’s wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime.” Id. at 316 (internal quotation marks omitted) (quoting Brueckner v. Norwich Univ., 169 Vt. 118, 730 A.2d 1086, 1095 (1999)). “[Ijntentional, wrongful, and even illegal conduct will not justify punitive damages unless the evidence supports *448 an inference of ‘bad motive’ evincing a sufficient ‘degree of malice.’ ” Id. (quoting Brueckner, 730 A.2d at 1097; Meadow-brook Condo. Ass’n v. S. Burlington Realty Corp., 152 Vt. 16, 565 A.2d 238, 245 (1989)).
Even construing the evidence in favor of the jury’s verdict and giving Fab-Tech the benefit of all reasonable inferences from the evidence that the jury might have drawn, see, e.g., Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir.2008) (per curiam), Vermont’s standard for punitive damages was plainly not met. Here, the award of punitive damages was limited to Fab-Tech’s claim for breach of the covenant of good faith and fair dealing arising from the 2000 Agreement.[2] Events preceding the 2000 Agreement are largely inapposite because they could not be construed as implicating the covenant of good faith under that agreement. In addition, conduct comprising the separate breach-of-contract claim against DuPont is not sufficient to establish a breach of the implied covenant. See Monahan, 893 A.2d at 316 n. 5 (making clear that the Vermont Supreme Court “will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract based upon the same conduct” (emphasis omitted)).
Given the above, Fab-Tech’s argument for punitive damages turns primarily on evidence of DuPont’s failure to disclose its self-interested actions to Fab-Tech after the 2000 Agreement was executed. Specifically, Fab-Tech points to DuPont’s failure to disclose to Fab-Tech that (1) around the summer and fall of 2000, DuPont accepted orders for Blue Powder from Woojin and Hi-Mang, and (2) in the spring and summer of 2001, DuPont helped Woojin and Hi-Mang obtain FM approval. DuPont’s mere failure to disclose these actions to Fab-Tech is insufficient to demonstrate fraud on DuPont’s part, however, nor does it support an inference that DuPont “intentionally and deliberately” caused damage to Fab-Tech.[3] See id. at 319. Even assuming a lack of communication may be sufficient to constitute a breach of the implied covenant of good faith in proper circumstances, DuPont’s nondisclosure simply failed to rise to the level of personal ill will or bad motive necessary to support punitive damages. See id. at 318; Brueckner, 730 A.2d at 1095-97. Fab-Tech has not directed this Court to any other evidence sufficient to support a punitive damages award. Therefore, we reverse the district court’s refusal to grant DuPont judgment as a matter of law on the punitive damages award and we remand with instructions to vacate that portion of the verdict in Fab-Tech’s favor.
However, we reject DuPont’s challenge to the sufficiency of the evidence supporting the damages award for Fab-Tech’s breach-of-contract claim arising from the 2000 Agreement. First, we conclude that the record contained sufficient evidence for the jury to find that DuPont breached *449 the “actively market” provision of the 2000 Agreement. Initially, we note that the district court correctly deemed the “actively market” provision of the 2000 Agreement to be ambiguous, a conclusion implicitly acknowledged by DuPont’s own internal email correspondence. Thus, interpretation of this provision presented a factual question for the jury to determine. See Dep’t of Corr. v. Matrix Health Sys., P.C., 188 Vt. 348, 950 A.2d 1201, 1204 (Vt.2008); Rich v. Chadwick, 139 Vt. 508, 430 A.2d 1280, 1282 (1981). We conclude that the record is sufficient to support the conclusion that DuPont’s dealings with Asian competitors constituted active marketing in breach of the 2000 Agreement.
We also hold that the record contained enough evidence for the jury to find that DuPont’s breach of the 2000 Agreement was causally linked to Fab-Tech’s damages. “For their contract claims, plaintiffs had to show that their damages were reasonably certain and foreseeable and were reasonably within the contemplation of the parties at the time in which they entered into the contract.” Gettis v. Green Mountain Econ. Dev. Corp., 179 Vt. 117, 892 A.2d 162, 172 (2005). DuPont’s citation to Gettis is unavailing, as that case is readily distinguishable from the present dispute. In Gettis, the defendants did not simply offer uneontroverted evidence that the plaintiffs’ injuries were not caused by the defendants’ breach; rather, “defendants’ expert testimony went directly to plaintiffs’ central claim and showed it to be false. ” Id. (emphasis added). Assuming, without deciding, that DuPont’s evidence on causation was uncontroverted, it still merely supports a “plausible alternative explanation” for Fab-Tech’s losses. Br. of Def./Appellant 38. Moreover, the trial court in Gettis found that plaintiffs’ contentions “relie[d] entirely on allegations and arguments, without citations to evidence,” and the Vermont Supreme Court agreed that plaintiffs’ theories were “wholly speculative.” Gettis, 892 A.2d at 172-74 (internal quotation marks omitted). Here, Fab-Tech relies on a significant amount of evidence that, even if disputed by DuPont, was still sufficient to support a jury verdict.
DuPont attempts to undermine Fab-Tech’s causation evidence by mounting a Daubert challenge against the testimony of Edward M. Graham, Fab-Tech’s expert witness. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). But this Court reviews the district court’s admission of expert evidence under Daubert deferentially, for abuse of discretion. Arnorgianos v. Nat’l R.R. Passenger Corp., 303 F.3d 256, 264 (2d Cir.2002). The district court’s decision on the admissibility of expert testimony should not be overturned unless it is “ ‘manifestly erroneous.’ ” Id. at 265 (quoting McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042 (2d Cir.1995)). And “[s]ignificantly, the abuse of discretion standard ‘applies as much to the trial court’s decisions about how to determine reliability as to its ultimate conclusion.’” Id. (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).
Given this Court’s highly deferential approach to reviewing determinations of the district court under Daubert, DuPont’s challenge to the reliability of Graham’s testimony is clearly insufficient to warrant reversing the district court’s decision to admit it. DuPont’s strongest point against Graham’s testimony is its contention that the December 2002 decision of the Korean Fair Trade Commission (“KFTC”) came too late to have caused Fab-Tech’s damages, since Fab-Tech’s Korean business had suffered a significant portion of its losses prior to December 2002. However, Graham’s deposition testimony explicitly acknowledged that the KFTC decision was not the primary cause of Fab-Tech’s inju *450 ries. We have considered DuPont’s other objections to Graham’s testimony, moreover, and find these to be equally without merit.
DuPont also argues that the district court should have granted it a remittitur on compensatory damages because the jury award improperly included labor costs and damages incurred after DuPont’s breach. This Court reviews a district court’s refusal to grant a remittitur for abuse of discretion. Cross v. N.Y. City Transit Auth., 417 F.3d 241, 258 (2d Cir. 2005); see also Browning-Ferris Indus, of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (“[T]he role of the district court is to determine whether the jury’s verdict is within the confines set by state law .... The court of appeals should then review the district court’s determination under an abuse-of-discretion standard.”). We agree with Fab-Tech that, under Vermont law, compensatory damages may include foreseeable labor costs, see Norton & Lamphere Constr. Co. v. Blow & Cote, Inc., 123 Vt. 130, 183 A.2d 230, 235 (1962), and post-breach damages, cf. Tour Costa Rica v. Country Walkers, Inc., 171 Vt. 116, 758 A.2d 795, 802 (2000) (defining reliance damages). Therefore, we conclude that the district court did not abuse its discretion in refusing to grant remittitur on the compensatory damages awarded in this case.[4]
All arguments not otherwise discussed in this summary order are found to be either moot or without merit.
For the foregoing reasons, the judgment of the district court is hereby affirmed in part, reversed in part, and remanded. Having determined that the UCC governed the 1999 Agreement, we remand to the district court with instructions to dismiss DuPont’s claim for breach of the 1999 Agreement on statute-of-limitations grounds. Nevertheless, we conclude that the district court did not abuse its discretion in admitting evidence concerning the 1999 Agreement, and we deny DuPont’s request for a new trial on this basis. We reverse the district court’s refusal to grant DuPont judgment as a matter of law on the punitive damages award, and we remand with instructions to vacate that portion of the verdict in Fab-Tech’s favor. Finally, with regard to the verdict in favor of Fab-Tech on the claim for breach of the 2000 Agreement, we conclude that the district court properly refused to grant DuPont a motion for judgment as a matter of law or a remittitur with respect to the jury’s compensatory damage award. The case is remanded for further proceedings not inconsistent with this order.

. The UCC itself does not provide a separate cause of action for violations of the covenant of good faith and fair dealing. See Vt. Stat. Ann. tit. 9A, § 1-304 cmt. 1 (Supp.2008).

. DuPont does not directly challenge the jury's verdict on the good faith claim under the 1999 Agreement, nor did the jury choose to award damages based on that claim. Therefore, we need not address it.

. Moreover, the mitigating factors surrounding DuPont’s actions demonstrate that these acts do not themselves support a punitive damages award. DuPont may not have disclosed its actions to Fab-Tech, but when notified that Fab-Tech considered these acts to be contrary to the 2000 Agreement, DuPont ceased its objectionable acts and attempted to conform its behavior to Fab-Tech’s understanding of the 2000 Agreement. Cf. Mona-han, 893 A.2d at 319. Thus, DuPont's actions fail to demonstrate the requisite "degree of malice” necessary to support punitive damages. See id. (internal quotation marks omitted) (quoting Brueckner, 730 A.2d at 1097).

. We note that DuPont did not specifically appeal the district court’s refusal to grant a new trial for compensatory damages. Moreover, its request for a new trial on punitive damages is mooted by our decision that DuPont is entitled to judgment as a matter of law on that issue.